1

2               **UNITED STATES DISTRICT COURT**
                     **DISTRICT OF NEVADA**
3                        **RENO, NEVADA**

4

5   BIGHORN DEVELOPMENT, INC., a          )        3:05-CV-00161-ECR (RAM)
    Nevada corporation; RIDGEWOOD         )
6   ASSOCIATES, INC., a Nevada            )
    corporation; RICHARD ANDREW           )
7   MALOTT, an individual; HERB           )           **Order**
    HINDEN, an individual; and            )
8   PETE ROSS, an individual,             )
                                          )
9   Plaintiffs,                           )
                                          )
10  vs.                                   )
                                          )
11  MICHAEL TRUMPOWER, an                 )
    individual; DOES 1 through 10,        )
12  inclusive; and ROE                    )
    CORPORATIONS 1 through 10,            )
13  inclusive,                            )
                                          )
14  Defendants.                           )
    _____)

15

16      This case arises out of a failed oil venture.  Starting in the

17  mid to late 1990s, several individuals and closely held companies

    invested approximately $13 million into a limited liability company
18
    headed by Defendant Michael Trumpower ("Defendant" or "Trumpower").
19
    The ultimate goal of this LLC was to start an oil drilling operation
20
    in two of the United Arab Emirates — Fujairah and Sharjah.  After
21
    what seemed to be a promising start, the venture failed when the LLC
22
    could not pay for completed seismic studies and was forced into
23
    involuntary bankruptcy.  This suit followed.
24

25

26                     **I. Procedural Background**

27      Plaintiffs are several of the investors and corporate entities

28  that put up money for the proposed operation.  They raise claims of

fraud, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.

Plaintiffs Bighorn Development, Inc., Ridgewood Associates, Inc., Richard Andrew Malott, Herb Hindin, and Pete Ross ("Plaintiffs") filed their Complaint (#2) on March 21, 2005 and immediately amended that complaint (#5) two days later. Richard Andrew Malott ("Rich Malott") is the sole shareholder and principal of Bighorn Development, Inc. ("Bighorn"). Richard Adelbert Malott ("Richard Malott"), not a party to this dispute, is the principal of Plaintiff Ridgewood Associates, Inc. ("Ridgewood"). Richard Malott is also Rich Malott's father.[1] On May 11, 2005, Trumpower filed a Motion to Dismiss (#3) under Federal Rule of Civil Procedure ("FRCP") 12(b)(3), which this Court denied (#19). Trumpower then answered (#24) the First Amended Complaint.

On October 24, 2005, Trumpower filed another Motion to Dismiss — alleging in part insufficient specificity on the fraud claim — which the Court denied (#59) on July 24, 2006; however, the Court required Plaintiffs to amend the Complaint "to identify the place or places where [any] misrepresentations occurred." (Id. at 9.) Plaintiffs filed a Second Amended Complaint ("SAC" #61) on August 11, 2006. Trumpower then filed a Motion to Dismiss the Second Amended Complaint (#62) for lack of personal jurisdiction, which this Court denied (#89).

---

[1]Throughout the record, the parties refer to both Malotts as "Richard." To avoid confusion, "Rich Malott" shall refer to "Richard Andrew Malott" (the son), and "Richard Malott" shall refer to "Richard Adelbert Malott" (the father).

2

1  On June 6, 2007, Plaintiffs filed a Motion for Summary Judgment

2 ("PMSJ" #76).  Defendant filed his Opposition ("DOMSJ" #86) on July

3 17, 2007, to which Plaintiffs replied ("PRMSJ" #87) on July 30,

4 2007.  On June 7, 2007, Defendant filed a Motion for Partial Summary

5 Judgment ("DMSJ" #77), which Plaintiffs opposed ("POMSJ" #85) on

6 July 16, 2007.  Defendant replied ("DRMSJ" #88) on July 31, 2007.

7 The motions for summary judgment (## 76, 77) are ripe, and we now

8 rule on them.

9

10  **II.  Statement of Disputed and Undisputed Facts**

11  In 1996, Plaintiffs Rich Malott and Ridgewood, through its

12 principal (Richard Malott), met Defendant, and the parties became

13 business associates.  (P.s' SAC ¶ 10.)  Subsequently, the parties

14 discussed and entered into several business ventures together,

15 including looking for lost gold and acquiring paintings.  (Id. ¶

16 11.)

17  In 1998, Defendant informed Plaintiffs that he would be able to

18 obtain an oil concession[2] in Fujairah, one of the United Arab

19 Emirates.  (Id. ¶ 12.)  Plaintiffs aver that Defendant represented

20 that he had the backing of the necessary "heavy money" — hundreds of

21 millions of dollars — but still wanted Plaintiffs to join in the

22 project.  (P.s' Answers to D.'s Second Set of Non-Uniform

23 Interrogatories 4-5 (#76-1 (Exhibit F) (hereinafter "Ex. F"); (Ross

24 Depo. 12); (Rich Malott Depo. 68-69).)  Plaintiffs Ridgewood and

25 Malott did not question Defendant's representations due to

26 _____

27  [2]A concession is the right to undertake oil exploration and extraction in a particular area and derive profits therefrom.

28  3

1  Defendant's purported CIA background and extensive Middle East

2  contacts.  (PMSJ 4-5 (#76-1).)   Defendant contends that the Malotts

3  knew from the beginning that the heavy money funding was never

4  certain, but that there was ongoing communication with various

5  potential sources of funding.  (DOMSJ 2-3 (#86).)

6      Because the Fujairah government had requested a $1 million bond

7  for the formal execution of the concession agreement, Plaintiffs

8  Malott, Ridgewood, and Defendant discussed the formation of a

9  limited liability company ("LLC") for oil exploration purposes.

10  (PMSJ 5 (#76-1).)   On September 9, 1998, Plaintiffs Malott,

11  Ridgewood, and Defendant formed MATCO Oil Exploration, LLC ("MATCO

12  Oil"), as a Nevada limited liability company.  (Id.)   Originally,

13  Ridgewood and MATCO Inc. — an LLC of Defendant Michael A. Trumpower

14  — were MATCO Oil's managers.   MATCO Oil raised $2 million for MATCO

15  Inc.'s exploration of the Fujairah concession via a private

16  placement offering.  (Id.)   Later, MATCO Inc. resigned as MATCO

17  Oil's manager, and Ridgewood assumed the sole management

18  responsibility of MATCO Oil.  (Id.)   MATCO Oil is now known as

19  Silver State Oil, LLC.  (Id.)

20      Defendant informed Plaintiffs Malott and Ridgewood that the

21  Fujairah concession was formally obtained in December 1998.  (Id.)

22  The concession allegedly gave MATCO Inc. the rights to explore and

23  derive profits from the "entire" land of Fujairah, both onshore and

24  offshore, for a certain period of time.  (Id.)   In return, MATCO

25  Inc. was entitled to retain a portion of the profits resulting from

26  the oil discovery and distribution.  (Id.)   Plaintiffs contend that

27  Trumpower claimed a personal interest of $10 million in any future

28                                    4

proceeds from the Fujairah concession, which he did not disclose to Plaintiffs. (D.'s Separate Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment ("DSOF") ¶ 50 (#80).)

Plaintiffs Malott and Ridgewood and Defendant continued to need additional "seed money" after obtaining the Fujairah concession to pay for seismic studies, which would indicate whether oil was present in the concession field. Due to the geographic position of Fujairah, it became impossible to perform some of the onshore and offshore studies without infringing on the territory of the Emirate of Sharjah. As a result, Defendant sought, and received, a concession from Sharjah in 2000. (PMSJ 8 (#76-1).) Trumpower allegedly took an individual claim in the future proceeds of the Sharjah concession in the amount of $5 million without telling Plaintiffs. (Ex. F 4-5 (#76-1).) Regardless, the delay in time needed to acquire the second concession, as well as the expanded scope of the seismic studies after the acquisition, significantly increased the total cost of the studies.

To pay for this cost, Plaintiffs raised and transferred several million dollars to MATCO Inc. (Id. at 6.) Plaintiffs transferred most of the capital through several Nevada LLCs created specifically for the venture. (Id.) The structure of the capital raising was relatively straightforward: Rich and Richard Malott would solicit funds from individuals for various LLCs and then transfer the funds to MATCO Inc. for use in the oil venture. (DSOF ¶ 13 (#80).) The Malotts would receive approximately nine to ten percent of any amount raised as a management fee. (Id.) There is a question as to whether the Malotts would retain these management fees for personal

5

use or whether they reinvested the proceeds into MATCO Inc.   (DMSJ 20-21 (#77); POMSJ 3 (#85).)

The LLCs initially created were (1) Overseas Oil, (2) Middle East Oil Exploration I, and (3) Middle East Oil Exploration II. Overseas Oil was originally managed by Trumpower's LLC, MATCO Inc. Overseas Oil raised $3.5 million for MATCO Inc.  MATCO Inc. later withdrew as the manager, and Bighorn now is the managing member of Overseas Oil.  (PMSJ 6 (#76-1).)  Middle East Oil I and Middle East Oil II raised $1.1 million and $2.2 million, respectively, for MATCO Inc.  These two LLCs are managed by Bighorn.  (Id. at 7.)

Each of the three LLCs was to receive a certain percentage of income from the oil exploration venture based on their respective contributions.  (Id.)  The entire venture, however, was originally projected to cost approximately $250 million.  (Id.)  Later estimates put the amount around $900 million.  (DSOF ¶ 17 (#80).)

After acquiring the Sharjah concession, Trumpower needed funds for MATCO Inc.'s expanded exploration of the area.  (PMSJ 8 (#76-1).)  In July 2000, Plaintiff Rich Malott formed RAM Oil, LLC, to assist MATCO Inc.'s Sharjah endeavor.  (Id. at 9.)  Bighorn was, and is, RAM Oil's managing member, and RAM Oil was funded with $2 million in capital, which it transferred to MATCO Inc.

Having thus accumulated over $13 million, MATCO Inc. constructed facilities in Prescott, Arizona, for its business operations and started exploration activities in the UAE.  Trumpower hired several scientists to work for the company.  The preliminary seismic studies in the UAE indicated that the exploration efforts could likely be successful with the potential for approximately 12

6

billion barrels of oil.  MATCO Inc., however, lacked the necessary funds to pay for the studies that were completed.  Plaintiffs contend that Trumpower misrepresented that he had the funds for the project.  (Ex. F 4-5 (#76-1), Ross Depo. 12.)

In January 2001, the parent company of the London firm hired to perform the seismic studies of the potential oil fields, Baker Hughes, forced MATCO, Inc, into involuntary Chapter 7 bankruptcy proceedings.  Trumpower allegedly believed that Baker Hughes brought the involuntary Chapter 7 petition against MATCO Inc. in bad faith in an attempt to purchase the concessions itself.

In February 2001, unaware of MATCO Inc.'s bankruptcy, Ridgewood — through Richard Malott — and MATCO Inc. formed another limited partnership named Silver State Oil II for the purposes of investing another $2.5 million in the Fujairah and Sharjah concessions.  (P.'s SAC ¶ 30 (#61).)  Of this $2.5 million, $500,000 was secured by a Deed of Trust to property owned by Trumpower, (Ex. W (#76-1),) and Trumpower personally guaranteed $100,000 advanced by Silver State Oil II.  (Ex. X (#76-1).)  After the formation of Silver State Oil II, Plaintiffs learned of MATCO Inc.'s bankruptcy and for the first time of Defendant's misrepresentations.

Between July 2001 and September 2001, MATCO Inc. and Baker Hughes engaged in settlement negotiations that, after a promising start, eventually fell through.  Trumpower then sought Plaintiffs' financial assistance so that he could travel to the Middle East and raise money for the venture.  Plaintiffs Herb Hindin and Pete Ross each loaned Trumpower $50,000.  In addition, Ridgewood loaned Trumpower $50,000.  All three executed promissory notes with

Trumpower; Ridgewood later assigned its note to Plaintiff Rich Malott, though it is not exactly clear when.

In January 2002, Ridgewood advanced Trumpower another $20,000 via a wire transfer. Plaintiff Ridgewood alleges that Trumpower was to repay this money; Trumpower asserts that the money was simply to fund his attempts to save the venture.

In April 2002, the bankruptcy judge entered an order granting relief to Baker Hughes as to MATCO Inc.'s inability to pay for the seismic studies performed. Baker Hughes ended up purchasing MATCO Inc.'s seismic data for approximately $10 million. To preserve MATCO Inc.'s right to appeal, Ridgewood advanced $5000 to MATCO Inc.'s bankruptcy attorney; Ridgewood claims this was a loan to Trumpower that has not yet been repaid.

During the bankruptcy proceedings, Trumpower's deposition was taken. Plaintiffs allege that Defendant's deposition marked the first time that they had heard the truth. For example, Defendant had only a high school diploma, and not a college degree, as he had told Plaintiff Rich Malott. (Rich Malott Depo. 108:16-18.) In addition, Defendant had taken an annual salary of $765,000, instead of the approximately $150,000 he told Plaintiffs he would take. (Id. at 108:19-23.) Moreover, Defendant had retained $15 million in personal interests in the concessions, making him MATCO Inc.'s biggest creditor. (PMSJ 13 (#76-1).)

Plaintiffs also allege that they learned that the scope of the concessions was narrower than what Defendant had represented. Plaintiffs thought the concessions encompassed the entire area of Fujairah, including onshore and offshore, and all of the offshore

area of Sharjah.  (PMSJ 13 (#76-1).)  In fact, the concessions required Plaintiffs to relinquish a certain percentage of territory over a period of time.  The concession agreements also required MATCO Inc. to fulfill certain requirements — such as successfully drilling to a certain depth — within a certain period of time. (DSOF ¶ 50 (#80).)

Further, Plaintiffs allege that Trumpower used a substantial portion of the funds they provided to MATCO Inc. for political and charitable contributions, real estate acquisitions and speculation, and a plane lease.  (Ex. F 4-5 (#76-1).)  Defendant argues that Plaintiffs — at least Ridgewood, Bighorn, and Rich Malott — knew of all these expenditures.  (DSOF ¶ 50 (#80).)  Rich Malott and Richard Malott even attended a dinner in Washington, D.C., where Trumpower was given an award as "Arizona Republican Businessman" of the year. (DOMSJ 5 (#86).)  Moreover, Defendant argues that the real estate purchases were for two buildings in Prescott to house MATCO Inc.'s operations and science center.  (Id.)

Defendant asserts, contrary to Plaintiffs, that both he and the Malotts knew that acquiring the heavy money funding was contingent on proving the existence of oil reserves in the concession areas. Initially Defendant thought that Barclays Bank might fund the project; however, when MATCO Inc.'s primary contact with Barclays left the company, Barclays' interest in MATCO waned. (McKean Depo. 68:2-69:21.)  In addition, Defendant claims that both he and the Malotts were actively involved in trying to raise the heavy money for the project.  (DSOF ¶ 58.)  Defendant contends that several large investment banks showed interest in the project.  (Id. ¶ 59.)

9

1  Further, Richard Malott attempted to arrange a meeting between
2  Trumpower and an investment group from California.  Trumpower
3  refused to meet with the group, believing the group to be "phony."
4  Trumpower turned out to be correct in this respect, apparently
5  several members of the group later went to prison on fraud charges.
6  (Depo. Richard Malott 96:15-97:8.)

7       Plaintiffs now contend that Defendant misrepresented material
8  information to them and has refused to repay money owed to them.

9

10                    **III.  Summary Judgment Standard**

11      Summary judgment allows courts to avoid unnecessary trials
12 where no material factual dispute exists.  <u>N.W. Motorcycle Ass'n v.</u>
13 <u>United States Dep't of Agric.</u>, 18 F.3d 1468, 1471 (9th Cir. 1994).
14 The court must view the evidence and the inferences arising
15 therefrom in the light most favorable to the nonmoving party,
16 <u>Bagdadi v. Nazar</u>, 84 F.3d 1194, 1197 (9th Cir. 1996), and should
17 award summary judgment where no genuine issues of material fact
18 remain in dispute and the moving party is entitled to judgment as a
19 matter of law.  Fed. R. Civ. P. 56(c).  Judgment as a matter of law
20 is appropriate where there is no legally sufficient evidentiary
21 basis for a reasonable jury to find for the nonmoving party.  Fed.
22 R. Civ. P. 50(a).  Where reasonable minds could differ on the
23 material facts at issue, however, summary judgment should not be
24 granted.  <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 441 (9th Cir.
25 1995), <u>cert. denied</u>, 116 S.Ct. 1261 (1996).

26      The moving party bears the burden of informing the court of the
27 basis for its motion, together with evidence demonstrating the

28                                   10

absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed. R. Civ. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary Judgement is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered.  Id.  Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a

11

matter of law.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  <u>Id.</u>

## IV.  Judicial Estoppel

Plaintiff Rich Malott filed a personal Chapter 7 bankruptcy petition on November 22, 2002.  (DMSJ 20 (#77); Depo. Rich Malott 341:9-342:13.)  He did not include any personal claims he had against Defendant Trumpower in his bankruptcy schedules. (Depo. Rich Malott 342:12-12; DSOF Ex. W (#80).)  Defendant argues that Plaintiff Rich Malott has no standing to sue because of his personal bankruptcy.  (DMSJ 20 (#77).)  While "standing" does not appear to be the appropriate issue, judicial estoppel enters the fray.

### A. Judicial Estoppel as to Rich Malott

Debtors who fail to disclose a claim in bankruptcy are barred from later bringing suit on that claim after the bankruptcy case is closed under the doctrine of judicial estoppel.  "Judicial estoppel," also known as the doctrine of preclusion of inconsistent positions, "is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." <u>Hamilton v. State Farm Fire & Casualty Co.</u>, 270 F.3d 778, 782 (9th Cir. 2001).  Judicial estoppel should be invoked "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration and regard for the dignity of judicial proceedings' and to 'protect against a litigant playing fast and

loose with the courts.'" Id. (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)) (alteration in original).

In Hamilton, the district court for the Central District of California held that a debtor could not fail to include potential causes of action in his bankruptcy schedules and then later sue to recover on those claims after the conclusion of the bankruptcy proceedings. Id. at 782. The district court concluded that so doing constituted asserting contradictory positions and hence barred the debtor's subsequent claims under the doctrine of judicial estoppel.  Id.

On appeal, the Ninth Circuit affirmed.  The court first noted that judicial estoppel is limited to cases where one court has "relied on, or 'accepted,' the party's previous inconsistent position." Id. at 783.  Next, the circuit continued that "[i]n the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements."  Id. Ultimately, the Ninth Circuit held that a debtor "is precluded from pursuing claims about which he had knowledge, but did not disclose, during his bankruptcy proceedings, and that a discharge of debt by a bankruptcy court, under the circumstances, is sufficient acceptance to provide a basis for judicial estoppel . . . ."  Id. at 784.

Here, Rich Malott declared bankruptcy in November 2002, and he later received a discharge.  All of the facts and events giving rise to his current lawsuit occurred and were known to him before that date.  Rich Malott did not disclose this potential lawsuit as an asset on his bankruptcy schedules.  He therefore will be judicially

estopped from asserting these claims now.  Defendant's Motion for Partial Summary Judgment will be granted as to all claims of Plaintiff Rich Malott that arose before the filing of his bankruptcy petition.

**B. Judicial Estoppel as to Bighorn, Inc.**

In his bankruptcy filings, Rich Malott listed Bighorn Inc. as one of his assets; however, he listed Bighorn as having no value. Defendant argues that if Bighorn is merely an alter ego of Rich Malott, then it should also be judicially estopped from asserting any claims against Trumpower.

There are three requirements for finding that a company is the alter ego of the principal and piercing the corporate veil: (1) the principal must influence and govern the corporation; (2) there must be "such unity of interest and ownership that one is inseparable from the other;" and (3) the facts must demonstrate that following the fiction of separate entities would "sanction a fraud or promote injustice." Lorenz v. Beltio, Ltd., 963 P.2d 488, 496 (Nev. 1998) (internal quotation omitted).  Although not conclusive, several factors tend to show the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to follow corporate formalities. Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 887 (Nev. 1987).

Defendant attempts to use a theory of reverse veil piercing — reaching the corporate entity through the individual, as opposed to reaching the individual through the corporate form — to prevent Plaintiff Bighorn from pursuing its case.  We note that the Nevada

14

Supreme Court allows for reverse veil piercing in certain circumstances. E.g. <u>LFC Mktg. Group, Inc. v. Loomis</u>, 8 P.3d 841, 846 (Nev. 2000) (holding that "reverse piercing is appropriate in those limited circumstances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted").

Here, the equities favor using reverse piercing, but the facts do not.  It seems likely that Plaintiff Rich Malott attempted to undervalue his assets, such as by ignoring Bighorn's potential claim against Trumpower in his personal Chapter 7 bankruptcy petition; however, the record does not sufficiently demonstrate that Bighorn was acting as the alter ego of Rich Malott.

For example, the record does not demonstrate a commingling of funds, though there are canceled checks written personally to "Richard Malott" that were intended for Bighorn.  Next, while the listing of Bighorn's assets as $0 on the bankruptcy schedules might indicate undercapitalization, the record is not clear on this point. Further, Defendant alleges that Rich Malott treated corporate assets as his own, but again, the record does not sufficiently support this allegation.  Last, there is no indication that corporate formalities were not followed.  Thus, Defendant's allegations do not suffice to meet the showing necessary to ignore the corporate fiction.

Plaintiff Bighorn will not be judicially estopped from pursuing its claims against Defendant.

//

//

15

**V. Fraud Claim**

The parties agree that a showing of fraud requires (1) a false representation, (2) knowledge or belief that the representation was false, (3) intent to induce reliance on the representation, (4) that the reliance must be justifiable, and (5) damages. <u>Lubbe v. Barba</u>, 540 P.2d 115, 117 (Nev. 1975).  The plaintiff has the burden of proving each element by clear and convincing evidence.  <u>Bulbman, Inc. v. Nevada Bell</u>, 825 P.2d 588, 592 (Nev. 1992).

Plaintiffs argue that Trumpower made at least three false representations.  First, Plaintiffs claim that Trumpower misrepresented the scope of the concession agreements.  Instead of having the right to explore and drill for oil in the entire territories of Fujairah and Sharjah, the concession agreements obligated MATCO to relinquish at least thirty percent of the territory back to the governments.  Second, Plaintiffs claim that Trumpower lied about his business qualifications, specifically that he had a college degree.  Third, Trumpower allegedly told investors that he had the heavy money lined up to finance the operations, and the investors were only providing seed money.

Plaintiffs contend that they justifiably relied on these misrepresentations, and that they would not have invested in the operation if not for Trumpower's actions.

**A. Representations to Hindin & Ross**

Defendant argues that the fraud claim fails because he made no false representations to either Plaintiffs Hindin or Ross.  First, Defendant argues that he told neither Plaintiff Hindin nor Plaintiff Ross anything about MATCO or its operations.  Defendant acknowledges

16

1  that he "executed personal promissory notes" to these two
2  plaintiffs, but that any and all representations to the two were
3  made by the Malotts.  (DMSJ 9 (#77).)  Defendant also argues that
4  Plaintiff Hindin invested in MATCO indirectly, through Bighorn or
5  Rich Malott, and before Hindin had even spoken to Trumpower.  (Id.
6  at 9-10.)  Further, Defendant argues that any representations that
7  he may have made were forward looking and thus cannot serve as a
8  basis for a fraud claim.  (DMSJ 10 (#77).)

9       There appears to be a genuine issue of material fact as to
10 whether or not Hindin knew that the heavy money had been secured
11 before investing.  Defendant avers that Hindin knew that the heavy
12 money funding was contingent on striking oil.  (DMSJ 10 (#77).)
13 Defendant acknowledges that if he told Hindin that Barclays would
14 fund MATCO, Trumpower thought in good faith that "at the time
15 Barclays indeed was contemplating arranging financing or capital to
16 Matco in the neighborhood of $600 million."  (Id.)  Conversely,
17 Hindin contends that Trumpower represented to him that Barclays
18 would fund the oil venture if the seismic studies were promising.
19 (Depo. Hindin 90:7-12.)

20      Whether or not Barclays was contemplating financing the venture
21 does not answer the question of whether or not there is a genuine
22 issue of material fact here.  If Hindin was told that Barclays would
23 fund the venture if the studies were promising, he could prevail on
24 his claim.  If, however, Hindin was merely told that Barclays may
25 fund the venture pending a successful oil well being drilled, then
26 his claim would likely fail.  There is sufficient ambiguity in the
27
28                                17

1 record as to this matter that granting summary judgment would be
2 inappropriate.

3 Defendant makes similar arguments regarding Plaintiff Ross'
4 claims.  First, Defendant contends that he never represented to Ross
5 that the big money was already lined up.  Next, Ross allegedly
6 invested with various Malott-controlled LLCs at least four times
7 before he met Trumpower.  (DMSJ 10 (#77).)  Further, Ross
8 purportedly never believed that the oil venture would pan out and
9 that he was never told anything about the credentials or oil
10 experience of Defendant.  (Id.)  Defendant avers that Ross simply
11 continued to pour money into the venture, though he knew it would
12 fail and that it lacked the big money necessary to keep going
13 because of a blind allegiance to, and faith in, the Malotts.

14 Ross alleges that Trumpower told him that he (Trumpower) "had
15 the funds [from Barclays] available[] to go through with the
16 development of the oil."  (Depo. Ross 12:9-11.)  Trumpower allegedly
17 told Ross this information when Ross, along with the Malotts,
18 visited Trumpower in Arizona.  (Id. at 12:21-13:6.)

19 Although it appears from the record that Plaintiff Ross has
20 resigned himself to the loss of almost $1 million, there is a
21 genuine issue of material fact as to whether Trumpower represented
22 that he had the heavy money lined up before seeking to enlist the
23 help of the little guy.

24 **B. Representations to the Malotts**

25 Defendant also argues that he made no misrepresentation to the
26 Malotts.  The Malotts, he contends, always knew that some $250 to
27 $900 million would need to be raised for the venture to be

28

successful, and that Richard Malott even took it upon himself to look for some investors of heavy money.  The Malotts, naturally, state that they thought that Defendant had the money lined up all along.  Richard Malott, for example, noted that although the alleged sources of the big money kept changing, Trumpower always represented that "he had the money available."  (Depo. Richard Malott 71:8-9.) Consequently, this will be an issue for a fact finder to decide, and hence summary judgment will be denied.

**C. Materiality**

Related to this, a fact finder will need to determine whether any one of Trumpower's alleged misrepresentations was material. First, the parties dispute what representations were made regarding the scope of the concession agreements.  The scope of the concessions could be material because all investments in MATCO Inc. were dependent on either the prospect or success of obtaining and developing the concession areas.  It is possible that Defendant can show that Plaintiffs should have known of the scope of the concessions: in essence, that there were restrictions and timetables.  On the other hand, Plaintiffs allege that Trumpower never showed anyone the final agreements.  In light of this, we cannot say at this stage that there is no genuine issue of fact as to whether or not the representations regarding the scope of the agreements were material.

Second, less likely to constitute a material representation, but still conceivably so, is Trumpower's alleged representation that he had a college degree when in fact he never attended college. Taken alone, this fact may not give rise to a claim of fraud;

however, it would be premature to conclude that as a matter of law Trumpower's alleged misrepresentation had no effect on Plaintiffs.

Third, whether or not Trumpower represented to anyone that he had the heavy money lined up is material to Plaintiffs' fraud claim. Trumpower's alleged representation that he had the money lined up purportedly instilled confidence in investors such that they felt comfortable pouring in ever greater amounts of cash.  It is possible that any combination of Plaintiffs may have known that obtaining a large source of funding was always contingent on striking oil. Likewise, it is possible that any combination of Plaintiffs may have been led to believe that the money would be there when needed.  It will be up to the fact finder to sort out who was told what and when.

### D. Scienter, Reliance, and Damages

Continuing in this vein, whether or not Trumpower knew that any alleged misrepresentation was false whenever he might have made one, as well as whether or not he intended to induce Plaintiffs into a particular course of action, is a question for the fact finder.  The same is true for the justifiable reliance element.

As for damages, Defendant argues that Plaintiffs were all accredited investors and understood that the proposed oil venture was risky at best.  All of the plaintiffs signed forms stating that they knew they could lose money.  While all investments carry some degree of risk, simply because Plaintiffs acknowledged that risk does not amount to a waiver of a future fraud claim.

Plaintiffs' Motion for Summary Judgment (#76) and Defendant's Motion for Partial Summary Judgment (#77) will be denied as several questions of material fact exist as to the claim of fraud.

## VI.  Breach of Contract Claim

A breach of contract claim requires Plaintiffs to show four elements: (1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages.  See Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (Nev. 1987) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement") (quoting Malone v. Univ. of Kan. Med. Ctr., 552 P.2d 885, 888 (Kan. 1976)).

Plaintiffs Hindin, Ross, Rich Malott, and Ridgewood argue that they had individual contracts with Trumpower in the form of promissory notes.[3]  Plaintiffs allege that Trumpower never paid them for the promissory notes, and hence breached the contract. Plaintiffs contend that they attempted to bring these claims against MATCO Inc. in MATCO Inc.'s bankruptcy proceedings; however, the bankruptcy judge did not allow the claims because Plaintiffs made the loans to Trumpower after the proceedings had been initiated.

Defendant argues that there "are no written agreements that obligate Defendant to pay or repay any of the funds referred to in

---

[3]The amounts and dates of the notes are as follows: Hindin ($50,000 — Nov. 9, 2001); Ross ($50,000 — Nov. 9, 2001); Rich Malott ($50,000 — Nov. 9, 2001); Ridgewood wire transfer ($20,000 — Jan. 31, 2002); Ridgewood Fee Payment ($5000 — April 25, 2002).  (PRMSJ 10 (#87).)  The record before the Court, however, does not include a copy of any tangible note.

Plaintiffs' complaint with the exception of the $50,000 promissory notes to Hindin, Ross[,] and the one to Ridgewood allegedly assigned to Rich Malott."   (DOMSJ 6 (#86).)   Thus, Defendant contends, Plaintiffs claims are "barred by the statute of frauds and the statute of limitations."   Further, Defendant argues that he did not personally obligate himself "on the three $50,000 promissory notes." (Id. at 7.)   Instead, the money was "intended and used for Matco's purposes and benefits."   (Id.)

### A. Evidence Available in the Record before the Court

To support their claim that a promise to repay the money exists, Plaintiffs point the Court to the depositions of Plaintiffs Ross and Hindin, as well as to a copy of a receipt of the wire transfer to Trumpower for $20,000 and a copy of a canceled check for $5000.   These exhibits, however, do not establish that there was an agreement with Trumpower that he personally would repay the money.

In Plaintiff Ross' deposition, he states that he did not "know if [the loan] was to Trumpower or to MATCO."   (Ross Depo. 47:9.) Similarly, Plaintiff Hindin indicated that the money was loaned to Trumpower to "pursue . . . alternate sources of funds," in other words, for MATCO Inc. expenses.   (Hindin Depo. 86:8-89:20.)

The wire transfer confirmation is simply that: a confirmation of receipt of a wire transfer.   (PRMSJ Ex. H (#87-2).)   Receiving money, however, does not give rise to a legally enforceable promise to repay that money.   The same is true of the copy of the canceled check, which was purportedly written to preserve MATCO Inc.'s right to appeal the bankruptcy court's ruling.   The check is made out to "Bryan Cave LLP," presumably Trumpower's bankruptcy attorney.   This

22

does not, however, establish that Trumpower promised to repay the $5000 to Ridgewood.

While Defendant's Opposition (#86) clearly indicates that there are written agreements that obligate Defendant to repay $50,000 each to Hindin, Ross, and Rich Malott by assignment, it is not clear whether these agreements bind Defendant personally.  Presumably the agreements do so bind Trumpower; however, the notes are not before the Court.

**B. Statute of Frauds**

Under the statute of frauds in Nevada, any contract to loan money for over $100,000 must be in writing if the loan is made by a person "engaged in the business of lending money or extending credit."  NRS 111.220(4).  Even assuming that the latter provision is satisfied, none of the original principal amounts exceeds $100,000; therefore, the statute of frauds does not bar these claims.

**C. Statute of Limitations**

The statute of limitations for a breach of contract claim in Nevada is six years if the contract is in writing or four years if the contract is not in writing.  NRS 11.190.  Here, the earliest of the promissory notes was executed on November 9, 2001, and Plaintiffs filed suit on March 21, 2005.  The statute of limitations does not bar Plaintiffs' claims.

**D. Plaintiff Rich Malott's Claims**

Plaintiff Rich Malott, however, might be barred from seeking payment on this claim as he did not list this asset in his bankruptcy filings.  Plaintiffs' Reply (#87) indicates that Rich

Malott's promissory note was executed on November 9, 2001; Plaintiff declared bankruptcy approximately one year later.  If Rich Malott received the assignment before declaring bankruptcy, then he cannot recover on the note because he did not list the note in his schedule of assets.  However, if he received the assignment after declaring bankruptcy, then he might be able to recover on the note.  There is insufficient information in the record to make any such determination at this time.

**E. Damages**

Defendant concedes that he executed the notes, but that the amount of damages, if any, must be determined at trial.  There is a genuine issue of material fact as to whether or not the notes obligated Trumpower personally, and hence there is an issue of fact as to the amount of any damages owed.

**VII.  Breach of Implied Covenant of Good Faith and Fair Dealing**

In every contract, there is an implied covenant of good faith and fair dealing.  "When one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith."  Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 923 (Nev. 1991).

Plaintiffs contend that Defendant violated the implied covenant of good faith because he never intended to pay back the promissory notes in question.

1     Defendant counters that all breaches of implied covenant claims
2 raise a Catch-22: either there is no contract and hence no implied
3 covenant, or there is a contract and any implied covenant claim
4 duplicates part of the contract claim.  (DOMSJ 7 (#86).)

5     While duplicative damages generally are not allowed, under
6 Nevada law there exists a separate claim for a breach of the implied
7 covenant of good faith and fair dealing.  See Hilton Hotels, 808
8 P.2d 919.  Defendant's argument is not well taken.

9     As noted above, there is a genuine issue of material fact as to
10 whether Defendant received the money on a personal basis or only as
11 President of MATCO Inc.  Even assuming that Defendant received the
12 money as President of MATCO Inc., however, Plaintiffs may succeed in
13 their claim if they can prove that Defendant never intended to repay
14 the money.  A finder of fact will need to determine whether
15 Defendant did not act in good faith in this respect.

16

17              **VIII.  Unjust Enrichment Claim**

18     A claim for unjust enrichment requires that Plaintiffs show the
19 following: "a benefit conferred on the defendant by the plaintiff,
20 appreciation by the defendant of such benefit, and acceptance and
21 retention by the defendant of such benefit under circumstances such
22 that it would be inequitable for him to retain the benefit without
23 payment of the value thereof."  Leasepartners Corp. v. Robert L.
24 Brooks Trust, 942 P.2d 182, 187 (Nev. 1997) (quoting Unionamerica
25 Mortgage v. McDonald, 626 P.2d 1272, 1273 (Nev. 1981)).

26     Plaintiffs argue that if they fail on either the breach of
27 contract or breach of implied covenant claims, they can still

28

prevail on a theory of unjust enrichment.  Plaintiffs aver that
Defendant was unjustly enriched by not repaying the promissory notes
and other loans.  (PMSJ 18 (#76).)

Defendant contends that he personally did not benefit from the
funds that Plaintiffs allegedly advanced; the funds were used for
MATCO Inc. and its investors.  (DOMSJ 7-8 (#86).)  This analysis is
addressed above.

For the same reasons as above, summary judgment will be denied.

## IX. LLC Bankruptcy Implications

Defendant contends that all of the LLCs associated with Rich
Malott dissolved upon his filing for personal bankruptcy per the
membership agreements; as such, those entities no longer exist.
Thus, the argument goes, any claims of those LLCs are not allowed.
Plaintiff Rich Malott argues that the entities may continue while
business is wound up.

Article IX of the Operating Agreements in question countenances
the dissolution and winding up of the LLCs.  The Article provides
that the bankruptcy of a member dissolves the LLC, unless a majority
of members votes to continue the company.  (DSOF Ex. G, Art. 9.1
(#80).)

The record is silent as to whether or not any company has voted
to continue.  However, it is also not clear that any of the LLCs
that Defendant contends has dissolved is a plaintiff in this suit.
Defendant lists the LLCs managed by Bighorn as being dissolved, but
does not list Bighorn itself as being dissolved.  Nevertheless,
Article 9.2 provides that after dissolution, the company may

26

1    continue to conduct only that business that is "necessary to wind up

2    the business and affairs of the Company."

3        It appears that any claim being pursued in this litigation

4    involves the process of winding up the business of any LLC that may

5    be implicated, if any LLC is implicated at all.  Thus, Defendant's

6    Motion for Summary Judgment (#77) as to this claim will be denied.

7

8                        **X. Conclusion**

9        In light of the above, several issues of material fact remain.

10       **IT IS THEREFORE HEREBY ORDERED THAT** Plaintiffs' Motion for

11   Summary Judgment (#76) is **DENIED.**

12       IT IS FURTHER ORDERED THAT Defendant's Motion for Partial

13   Summary Judgment (#77) is **GRANTED** in part and **DENIED** in part as

14   follows.

15       Defendant's Motion for Partial Summary Judgment (#77) is

16   **GRANTED** insofar as it relates to claims of Richard Andrew Malott

17   that arose prior to the filing of his personal Chapter 7 bankruptcy.

18       Defendant's Motion for Partial Summary Judgment (#77) is **DENIED**

19   in all other respects.

20

21   DATED: March  __27__ , 2008.

22

23                                   UNITED STATES DISTRICT JUDGE

24

25

26

27

28                          27